AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

FILED

OCT 10 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>One (1) Black Cricket ZTE cell phone<br>Sealed in HSI Evidence Bag # A3728051 | )<br>)<br>)<br>)<br>)<br>) |

Case No.   19 MJ 4452

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. 952, 960, & 963 | Importation of a Controlled Substance, Conspiracy to Import a Controlled Substance |
| Title 31 U.S.C. 5332 | Bulk Cash Smuggling into or out of the United States |

The application is based on these facts:

See attached affidavit of Special Agent Bryan Bauerle

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bryan Bauerle, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____10/10/19_____

_____
*Judge's signature*

City and state:  San Diego, California          Hon. Linda Lopez, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Special Agent Bryan J. Bauerle, being duly sworn, hereby state as follows:

**INTRODUCTION**

1.  I submit this affidavit in support of an application for a warrant to search the following electronic device(s):

> Black Cricket ZTE cell phone
>
> Sealed in HSI Evidence Bag # A3728051
>
> ("Target Device")

as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Section(s) 952, 960 and 963, and Title 31, United States Code, Section 5332, as further described in Attachment B.

2.  The requested warrant relates to the investigation and prosecution of Maria GUZMAN-Reyes ("Defendant") for importing approximately 44.42 kilograms (97.72 pounds) of methamphetamine from Mexico into the United States. *See U.S. v. Guzman-Reyes* Case No. 19cr3987 (S.D. Cal.) at ECF No. 11 (Information). The Target Device is currently in the evidence vault located at 880 Front Street, Suite 3200, San Diego, CA 92101.

3.  The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Device, it does not contain all the information known by me or other agents regarding this investigation.  All dates and times described are approximate.

**BACKGROUND**

4.  I have been employed as a Special Agent with Homeland Security Investigations (HSI) since May 2007. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

5.  During my tenure with HSI, I have participated in the investigation of various

drug trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California.

6. Through my training, experience, and conversations with other members of law enforcement, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry. I am aware that it is common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones. Because they are mobile, the use of cellular telephones permits narcotics traffickers to easily carry out various tasks related to their trafficking activities, including, *e.g.*, remotely monitoring the progress of their contraband while it is in transit, providing instructions to drug couriers, warning accomplices about law enforcement activity, and communicating with co-conspirators who are transporting narcotics and/or proceeds from narcotics sales.

7. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in narcotics trafficking investigations, I am aware that individuals engaged in drug trafficking commonly store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in drug trafficking, as well as images and videos of drugs or contraband, proceeds and assets from drug trafficking, and communications to and from recruiters and organizers.

8. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a.  tending to indicate efforts to import methamphetamine, or some other federally controlled substance, from Mexico into the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

c.  tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

d.  tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States, such as stash houses, load houses, or delivery points;

e.  tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

9.      On September 8, 2019, at approximately 10:40 p.m., defendant Maria GUZMAN-Reyes ("Defendant") applied for permission to enter the United States at the Otay Mesa Port of Entry. Defendant was the driver, and Madai Dupo-Guzman the passenger, of a Ford Escape. Defendant was referred for secondary inspection, and Customs and Border Protection Officers discovered eighty-four packages concealed within the spare tire, cargo area, and dash of Defendant's vehicle. The packages weighed approximately 44.42 kg (97.72 lbs.), and field-tested positive as methamphetamine. Defendant was subsequently arrested, and the Target Device was seized from Defendant.

10.     Later, agents read Defendant her *Miranda* rights, and she agreed to speak to agents without an attorney present. Defendant denied knowledge of the drugs in her vehicle, but admitted that she had agreed to smuggle money from Mexico into the United States. Defendant said that she found the job on a Facebook page advertising for "work

for San Diego and San Ysidro." Defendant stated the job was explained to her as moving money from Mexico into the United States for a money remitting service. Defendant said that she was to be paid $2,000 USD to smuggle what she believed would be approximately $20,000 USD.

11.    Defendant stated she took the Escape to the Plaza Rio area of Tijuana, Mexico by herself. Defendant said that she met with someone and was asked to hand over her car keys and leave the vehicle so that the money could be hidden. Defendant told the agents that she asked to make sure that it was not drugs she was smuggling. Defendant said that she was assured that it was not drugs and only money concealed in the vehicle.

12.    Defendant stated that she thought that the job seemed easy and she agreed to smuggle because she needed the money. Defendant said that she knows it is illegal to smuggle money into the U.S. without declaring it at the POE. Defendant stated had a feeling that something bad was tied to the money.

13.    Defendant indicated that she was supposed to park at McDonalds near the Otay Mesa POE if she had successfully crossed and then call someone for further information once she arrived. Defendant said that this was her first attempt to smuggle money into the United States.

14.    Following the interview of the Defendant, agents sat with Dupo and read her *Miranda* rights, and she agreed to speak to agents without an attorney present. Dupo said that she and Defendant went together to the Plaza Rio area of Tijuana to drop the vehicle off, where Defendant met with someone that Dupo did not know. Dupo stated they then went back to house where they were staying in Tijuana. Dupo said that they returned later to the same spot to pick up the Escape at a prearranged time. Dupo stated she went with Defendant to both drop off and pick up the vehicle.

15.    Dupo said that Defendant knew that they were taking money back to the United States. Dupo stated she was not sure what the money was from. Dupo indicated that Defendant had been on a Facebook page about crossing money into the United States. Dupo stated Defendant knew about, and had told Dupo, the details regarding when they

would drop off and pick up the vehicle, and that there would be a GPS device concealed inside.

16.    Dupo stated Defendant initially had informed Dupo's sister, Anat Dupo-Guzman (Anat), about the job.  Dupo said that both she and Anat did not want Defendant to smuggle the money.  Dupo stated Defendant found the page about the job approximately two weeks prior.  Dupo said that Defendant was supposed to drive to Santa Ana, CA to deliver the vehicle to be unloaded, but Dupo did not know who Defendant was supposed to contact there.

17.    Following the interview with Dupo, agents spoke with Anat via telephone.

18.    Anat said that Defendant found the Facebook page about crossing money into the United States a little less than a month ago.  Anat thought that it was for a money exchange service.  Anat admitted that she thought that the money would be coming from something "sketchy."  Anat indicated that the event leading to Defendant's arrest was possibly Defendant's third attempt at smuggling currency.  Anat said that she did not believe that Dupo was told about the two previous attempts.  Anat stated Defendant traveled to Santa Ana, CA on both previous trips to deliver the money.  Anat said that Defendant went and dropped the car off in Santa Ana, and then ultimately brought it back to San Diego.

19.    In light of the above facts, Defendant's statements, and my own experience and training, there is probable cause to believe that Defendant was using the Target Device to communicate with others to further the importation of illicit narcotics or narcotics proceeds into or out of the United States.  Specifically, I believe that Defendant, as well as other persons as yet unknown, was involved in an ongoing conspiracy to import methamphetamine or some other prohibited drugs into the United States and/or export or import money into or out of the United States.  Probable cause also exists to believe that Defendant may have used the Target Device to coordinate with co-conspirators regarding the importation and delivery of the methamphetamine, and to otherwise further this conspiracy both inside and outside the United States.  I also know that recent calls made

and received, telephone numbers, contact names, electronic mail (email) addresses, Facebook messages, appointment dates, text messages, pictures and other digital information are stored in the memory of cellular telephones which identify other persons involved in narcotics trafficking activities.

20.    In my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Defendant claimed in her post-arrest statement that this was her first and only time smuggling cash in response to the Facebook advertisement. However, Dupo indicated that Defendant had found the Facebook advertisement approximately two weeks prior to her arrest, while Anat indicated that it was a little less than a month ago. Anat further explained that Defendant and Dupo travel to Tijuana nearly every weekend, and that this was possibly Defendant's third attempt at smuggling currency. Furthermore, Defendant stated to agents that she was making continuous payments to the owner of the load vehicle, which she claimed she had purchased a year ago. For these reasons, I request permission to search the Target Device for data beginning on June 8, 2019 until September 9, 2019, the day following Defendant's arrest.

**METHODOLOGY**

21.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary

word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

22.    Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

23.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

24.    Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

**CONCLUSION**

25.    Based on the facts and information set forth above, there is probable cause to believe that a search of the Target Device will yield evidence of Defendant's violations of Title 21, United States Code, Sections 952, and 960, and Title 31, United States Code, Section 5332.

26.    Because the Target Device was seized at the time of Defendant's arrest and has been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the Target Device.  As stated above, I believe that the appropriate date range for this search is from June 8, 2019 through September 9, 2019.

27.    Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item(s) described in Attachment A and seize the items listed in Attachment B using the above-described methodology.


I swear the foregoing is true and correct to the best of my knowledge and belief.


_____
Special Agent Bryan J. Bauerle
Homeland Security Investigations

Subscribed and sworn to before me this ___10th___ day of October, 2019.


_____
Hon. Linda Lopez
United States Magistrate Judge

## **ATTACHMENT A**
PROPERTY TO BE SEARCHED

The following property is to be searched:

> Black Cricket ZTE cell phone
> Sealed in HSI Evidence Bag # A3728051
> ("Target Device")

The Target Device is currently in the possession of Homeland Security Investigations, 9495 Customhouse Plaza, San Diego, CA 92154.

# ATTACHMENT B
### ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of June 8, 2019 through September 9, 2019:

    a.    tending to indicate efforts to import methamphetamine, or some other federally controlled substance or cash, from Mexico into the United States, or from the United States into Mexico;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance or cash, from Mexico into the United States, or from the United States into Mexico;

    c.    tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance or cash, from Mexico into the United States, or from the United States into Mexico;

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance, or cash, from Mexico into the United States, or from the United States into Mexico, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the Target Device; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963, and Title 31, United States Code, Section 5332.